83 N.J. 67 (1980)
415 A.2d 1147
IN THE MATTER OF THE REVIEW OF ADMINISTRATIVE PROMULGATION OF THE HEALTH CARE ADMINISTRATION BOARD: N.J.A.C. 8:30-14.1 THROUGH 8:30-14.6.
NEW JERSEY ASSOCIATION OF HEALTH CARE FACILITIES, A CORPORATION NOT FOR PROFIT OF THE STATE OF NEW JERSEY, AND WAYNE HAVEN NURSING HOME, VALLEY NURSING HOME, PINE REST NURSING HOME, DUNROVEN NURSING HOME, ALLENDALE NURSING HOME, WELLINGTON HALL NURSING HOME AND WOODCLIFF LAKE MANOR NURSING HOME, APPELLANTS,
v.
JOANNE E. FINLEY, M.D., STATE COMMISSIONER OF HEALTH, AND THE HEALTH CARE ADMINISTRATION BOARD, RESPONDENTS, AND PUBLIC ADVOCATE OF NEW JERSEY, INTERVENOR-RESPONDENT.
The Supreme Court of New Jersey.
Argued March 4, 1980.
Decided May 28, 1980.
*72 Adrian M. Foley, Jr. argued the cause for appellant nursing homes (Connell, Foley & Geiser, attorneys; R. Peter Connell, on the brief).
Jonathan D. Weiner argued the cause for appellant New Jersey Association of Health Care.
Thomas C. Fox, a member of the bar of the District of Columbia, argued the cause for amicus curiae American Health Care Association (Jonathan D. Weiner, attorney; Joel M. Hamme and E. Michael Flanagan, members of the bar of the District of Columbia, on the brief).
*73 Andrea M. Silkowitz, Deputy Attorney General, argued the cause for respondents Finley and Health Care Administration Board (John J. Degnan, Attorney General of New Jersey, attorney; Stephen Skillman, Assistant Attorney General, of counsel; Frederick S. Title, Deputy Attorney General, on the brief).
Arthur Penn, Assistant Commissioner, argued the cause for respondent Public Advocate (Stanley C. Van Ness, Public Advocate of New Jersey, attorney pro se).
Toby S. Edelman, a member of the bar of the District of Columbia, submitted a brief on behalf of amicus curiae Gray Panthers.
Mary K. Brennan submitted a brief on behalf of amicus curiae New Jersey Hospital Association.
The opinion of the Court was delivered by SULLIVAN, J.
We granted certification, 81 N.J. 330 (1979), to consider challenges to the legality of administrative regulations, N.J.A.C. 8:30-14.1 et seq., which were adopted by the Commissioner of Health with the approval of the Health Care Administration Board. In essence, the regulations require nursing homes to make available "a reasonable number of [their] beds to indigent persons" as a condition of licensure. N.J.A.C. 8:30-14.4(a). The Appellate Division upheld the regulations. 168 N.J. Super. 152 (1979). We affirm.
The events leading up to the adoption of the administrative regulations were summarized by the Appellate Division as follows:
The record before us amply demonstrates that N.J.A.C. 8:30-14.1 et seq. was adopted in an effort to alleviate the acute shortage of long-term care nursing home beds available for indigent persons in this State. Apparently, state-licensed nursing homes were largely unwilling to voluntarily accept and treat indigent patients. Although the State Medicaid program reimbursed qualified *74 nursing homes which voluntarily accepted indigents for their care at standard rates, the homes could generally obtain greater fees from private paying patients than from Medicaid reimbursement. This fact led to the unwillingness of many private nursing homes to accept indigent persons. Consequently there developed a severe shortage of accommodations for indigents. Whereas it normally took one to three days for a private pay patient to find an available nursing home bed, it often required six to eight months for a Medicaid eligible patient. As a consequence of this acute shortage many Medicaid eligible patients needing nursing home care had to remain in their homes or in general care hospitals or other institutions unsuited to their requirements for undue periods or indefinitely. Another critical situation was presented by the plight of paying patients who were forced to vacate when their financial resources were depleted (so-called "transfer-trauma"). [168 N.J. Super. at 158]
Recognizing the serious problem, the Department of Health at the request of the Director of the State Medicaid Program, asked the Attorney General whether the Department of Health could include a requirement in its health facility licensing standards that proprietary facilities accept and treat a certain number of indigent patients. By letter opinion dated January 31, 1975, the Attorney General advised that the Department lacked the power to include such a requirement in its licensing standards. However, at the urging of the Commissioner of Health,[1] the Attorney General reconsidered the question and in Formal Opinion No. 15-1977 ruled that a nursing home could be required to provide for the care and treatment of a specified number of indigent persons as a condition of licensure. The opinion noted that there was an acute shortage of nursing home beds available for indigent persons. It referred to the statutory provisions for health care facilities, N.J.S.A. 26:2H-1 et seq., and *75 particularly section 12(b) which authorizes the Department of Health to condition licensure of a health care facility upon findings that the "premises * * * and standards of health care services are fit and adequate." The opinion also emphasized that since nursing homes are given a special status under section 7 by being allowed to operate largely on a noncompetitive basis, it was therefore implicit under this statutory provision that a nursing home must fully serve the public interest in its approved area or region.[2] See N.J.S.A. 26:2H-7.
Proposed regulations were immediately drafted by the Commissioner. At the October 6, 1977 meeting of the Health Care Administration Board[3] (Board), representatives of the nursing home industry who had received copies of the proposed regulations were given the opportunity to present objections. The proposed regulations were then published in 9 N.J.R. 516(a) (1977), and resulted in the receipt of numerous comments which were considered by the Department. Some modifications of the proposed regulations were made and submitted to interested persons including appellant Association prior to the Board meeting of January 5, 1978. At that meeting, after further discussion in which interested persons were allowed to participate, the Commissioner, with the approval of the Board, adopted the regulations. N.J.A.C. 8:30-14.1 et seq. (effective January 24, 1978).
Basically, the regulations require a long-term care facility (licensed nursing home) as a condition of licensure, to make available "a reasonable number of its beds to indigent persons." As an alternative, the Department may require a facility to *76 maintain all patients regardless of a change in their economic status. N.J.A.C. 8:30-14.4(a). Under the regulations, the Department is to notify the facility of the requirement to make available a percentage of its beds to indigent persons 90 days prior to the renewal of a license or upon application for a license for a new facility. Ibid. An indigent person is defined as "a person participating in the State Medicaid program and certified as needing nursing care, or a person who could meet the eligibility requirements for receiving nursing care under the State Medicaid program." N.J.A.C. 8:30-14.3.
In determining whether to require a long-term care facility to provide a reasonable number of its beds for indigent care, or to require a facility to maintain all patients regardless of their economic status, the Department is required to consider but is not limited to the following:
1. Whether there currently exists a long-term care bed shortage for indigent persons, and if so, the extent and location of the shortage;
2. The State health plan or the plans of the appropriate health systems agencies;
3. The length of time indigent persons must await for placement of long-term care facility;
4. The costs of providing care to indigent persons in need of nursing care to other health care providers;
5. Whether the nursing home would be able to make a just and reasonable rate on equity if required to accept and care for indigent persons;
6. Whether a certificate of need granted for a new, expanded or modernized long-term facility included a commitment to provide a specified number of beds for indigent persons. [N.J.A.C. 8:30-14.4(b)]
Opportunity to be heard on the administrative determination is provided as follows:
i. Any nursing home which feels it cannot make a just and reasonable rate on equity if required to accept indigent persons may request an administrative review of that decision at least 60 days prior to the date for renewal of its license, at which time the facility shall submit to the department a detailed cost analysis substantiating its claim.

*77 ii. If, after an administrative review of the decision, the department finds against the long-term care facility, it shall notify the facility within 30 days of the date for renewal of its license.
iii. Consistent with the Administrative Procedure Act and chapter 136 (Health Care Facilities Planning Act of 1971), the long-term care facility may ask for an administrative hearing within 30 days of the revocation notice from the department.
iv. Applicants for licensure of a new facility shall have the same opportunity for an administrative review and for a hearing on the non-issuance of a license. [N.J.A.C. 8:30-14.4(b)(6)]
Following the January 5, 1978 adoption of the regulations, appeals were filed by the New Jersey Association of Health Care Facilities and by a number of nursing homes. The appeals were consolidated and, after hearing argument, the Appellate Division filed its opinion upholding the regulations. 168 N.J. Super. 152 (1979). Appellants attack the facial validity of the regulations. This appeal does not involve a challenge by any nursing home to a particular allotment of beds for indigents  that is  to the regulations as applied. Appellants argue that the regulations (1) are not within the power delegated to the Board by the State Legislature, (2) effect a taking for public use without just compensation, (3) are unconstitutionally vague, (4) violate equal protection, and (5) conflict with the Federal Medicaid statute.

I.
Although the Department, subject to Board approval, is specifically authorized to "adopt and amend rules and regulations * * * to effectuate the provisions and purposes of this act," N.J.S.A. 26:2H-5(b), appellants argue that the regulations in question exceed the power given to the Department by the Legislature in N.J.S.A. 26:2H-1 et seq. and are therefore void. Specifically, appellants contend that the Department is attempting to regulate the quantity of health services through licensure. Appellants argue that this amounts to a misuse of that function in that licensure is designed to control only the quality of such services.
*78 The Appellate Division found this argument to lack merit. We agree. It is undisputed that there is an acute shortage of nursing home beds available for indigent persons in this State. This suffices to justify the Department's action. Indeed, the regulations adopted express the Commissioner's finding that the health of indigents "is now or will be in danger because of the acute long-term care bed shortage for the indigent in the State * * *." N.J.A.C. 8:30-14.1. The public policy of this State as expressed in the pertinent statute is that health care services "of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health." N.J.S.A. 26:2H-1 (emphasis added), see Borland v. Bayonne Hospital, 72 N.J. 152, cert. den. 434 U.S. 817, 98 S.Ct. 56, 54 L.Ed.2d 73 (1977). To that end, the Department of Health has been designated as the sole agency in the State for comprehensive health planning under the National Health Planning and Resources Development Act of 1974 as amended and supplemented, 42 U.S.C.A. § 300k et seq. Accordingly, the Department is vested with "the central, comprehensive responsibility for the development and administration of the State's policy with respect to health planning, hospital and related health care services and health care facility cost containment programs * * *." N.J.S.A. 26:2H-1 (emphasis added). Additionally, "all public and private institutions * * * serving principally as boarding, nursing * * * or other homes for the sheltered care of adult persons * * * [are] subject to the provisions of this act." Ibid.
Even though privately owned, nursing homes, like other health care facilities, are quasi-public entities and are subject to extensive regulation in the public interest. See Doe v. Bridgeton Hospital Ass'n, Inc., 71 N.J. 478 (1976). A new nursing home must demonstrate the need for nursing services in the area to be served to avoid any unnecessary duplication of health care services. N.J.S.A. 26:2H-8 provides that no certificate of need shall be issued unless the action proposed in the *79 application, among other things, "will contribute to the orderly development of adequate and effective health care services." Under N.J.S.A. 26:2H-12(b)(2) a license for a health care facility "shall be issued by the department upon its findings that the premises * * * and standards of health care services are fit and adequate and there is reasonable assurance the health care facility will be operated in the manner required by this act and rules and regulations thereunder." The foregoing statutory provisions make it clear that the Department has the power to require a health care facility, within reasonable limits, to provide needed health care services in the area served by it and to condition licensure on the providing of "fit and adequate" service. Although the statute does not contain an express grant of power to the Commissioner to allocate beds to indigents, we find that power is implied. Delegation of authority to an administrative agency is construed liberally when the agency is concerned with the protection of the health and welfare of the public. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562-563 (1978); In Re Suspension of Heller, 73 N.J. 292, 303 (1977).
We conclude that the regulations in question are not arbitrary, capricious or unreasonable and are a proper exercise of the police power. That power may be exercised to alleviate emergency conditions. Hutton Pk. Gardens v. West Orange Town Council, 68 N.J. 543, 566 (1975); Jamouneau v. Harner, 16 N.J. 500, 514 (1954). Emergency conditions create a public need which justifies the exercise of the police power. Hutton Pk. Gardens, supra, 68 N.J. at 566-567; Jamouneau, supra, 16 N.J. at 514. There is a demonstrated shortage of nursing home beds for indigents. A waiting period of six to eight months to find an available nursing bed for a Medicaid eligible patient, referred to by the Appellate Division, cannot be tolerated. See 168 N.J. Super. at 158. Appellants' proposed solution of additional nursing homes will not necessarily solve the problem as these homes, unless required to do so, will also probably accept higher *80 paying private patients rather than Medicaid patients.[4] The record indicates that the resources of many private nursing home patients become exhausted and, if they are forced to seek other accommodations, become subject to a recognized condition known as "transfer-trauma." See 168 N.J. Super. at 158. The regulations are also designed to cope with this serious problem. Appellants' suggestion that the Department's power to require the furnishing of nursing care to the indigent should be limited to new nursing homes would be manifestly unfair to the new facilities, as well as to the indigents who would have to await the construction of new facilities. All nursing homes should be required to share in the burden of caring for indigent patients. Property rights have always been held to be subject to the common good and the public welfare. The police power "generally * * * may be exerted whenever necessary for the preservation of the public health, morals, comfort, order and safety." State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504, 519 (E. & A. 1935). The Commissioner's power to act in this critical area must be recognized.

II.
The contention that the regulations are a taking of private property for public use without just compensation in violation of U.S.Const., Amend. V, U.S.Const., Amend. XIV, § 1 and N.J.Const., (1947), Art. I, ¶ 20, is similarly without merit. Administrative regulations enjoy a presumption of legality and unless clearly ultra vires on their face, and we have held they are not, the person attacking them has the burden of proving their invalidity. New Jersey Guild of Hearing Aid Dispensers v. *81 Long, supra, 75 N.J. at 561. Restrictions on the use of property, if in furtherance of a valid governmental purpose, serve the public interest and are considered a proper exercise of the police power even though they may result in some economic disadvantage. Local rent control is a prime example of such police power regulation. Hutton Pk. Gardens v. West Orange Town Council, supra.
In requiring a nursing home to make available a reasonable number of its beds to indigent persons, the regulations do give recognition to the economics involved in that Medicaid reimbursement for indigent care is available. Also, the Department is required to consider whether the nursing home will be able to make "a just and reasonable rate on equity" if required to accept and care for indigent persons. N.J.A.C. 8:30-14.4(b)(5).[5] Furthermore, a nursing home is given the right to administrative review of any allotment of beds to indigents if it feels it cannot make a just and reasonable rate on equity, N.J.A.C. 8:30-14.4(b)(6), and judicial review of the administrative ruling is afforded under R. 2:2-3(a)(2). Whether the regulation, as applied, will result in arbitrary and unreasonable allotments and deny a just and reasonable rate on equity will depend on the factual circumstances of each particular case. Bayshore Sew. Co. v. Dep't of Env., N.J., 122 N.J. Super. 184, 204-205 (Ch.Div. 1973), aff'd o.b. 131 N.J. Super. 37 (App.Div. 1974). In summary, the regulations in question are directed at an acute social problem affecting the health and welfare of the needy aged and infirm, are well within the power and authority vested in the Department by the Legislature and do not constitute a taking of private property without just compensation.

*82 III.
A further challenge to the regulations involves the terms "reasonable number" of beds for indigents and "just and reasonable rate on equity." Appellants argue that the language is unconstitutionally vague in that no adequate definition thereof has been provided. It is fundamental that administrative regulations must not only be within the scope of the delegated authority, but also must be sufficiently definite to inform those subject to them as to what is required. At the same time, regulations must be flexible enough to accommodate the day-to-day changes in the area regulated. See Trap Rock Industries, Inc. v. Kohl, 59 N.J. 471, 483 (1971).
We conclude that the challenged terminology is definite enough to satisfy the requirements of due process. N.J.A.C. 8:30-14.4(b), quoted supra, specifies precise and adequate criteria which the Department must consider in determining whether to require a nursing home to provide a reasonable number of its beds for indigent care or to require it to maintain all persons regardless of their economic status. Although the regulation literally applies to whether a nursing home should be required to provide any beds for indigents, obviously the same criteria would apply to a determination of the number of such beds a nursing home would be required to provide.
We find the term "just and reasonable rate on equity" to be sufficiently definite. In Troy Hills Village v. Parsippany-Troy Hills Tp. Council, 68 N.J. 604, 628-630 (1975), we applied the term "just and reasonable" with respect to the rate of return in a rent control situation. Similar phrases have been interpreted by courts and sustained. See Ward v. Scott, 11 N.J. 117, 124-125 (1952). The term "just and reasonable" is common parlance in the field of public utility ratemaking. See N.J.S.A. 48:2-21; Public Service Coordinated Transport v. State, 5 N.J. 196, 216-217 (1950). We conclude that the standards used in the regulations are definite enough to be understood and followed *83 and yet flexible enough to give the Department the necessary discretion to proceed on an individual basis weighing the particular circumstances of each nursing home. Trap Rock Industries, Inc., supra.

IV.
The equal protection argument is advanced that proprietary homes are being singled out to render care for indigents either for no reimbursement whatsoever, or for a reimbursement from Medicaid at less than the actual cost of such care. The additional argument is made that these nursing homes will be required to charge their private patients higher rates to compensate for the loss sustained on the indigent patients with the result that private patients will be indirectly subsidizing the cost of maintaining indigent patients.
The classification at issue embraces both private and public health care facilities. These facilities, as noted, supra, are involved in a quasi-public activity and are therefore subject to extensive regulation in the public interest. Admittedly, the classification is neither a suspect one nor does it implicate fundamental rights. Strict scrutiny therefore does not come into play and appellants would have the burden of proving that a rational basis for such classification does not exist. Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp., 80 N.J. 6, 39-40 (1976), app. dism. and cert. den. sub nom. Feldman v. Weymouth Township, 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977).
The State has an obligation to see to the availability of health care services needed by its indigents. All hospitals, whether public or private, are expected to provide care for the needy sick. N.J.A.C. 8:43B-1.11. Nursing homes are an integral part of health care services and, likewise, can be required, within reasonable limitations, to meet the need for indigent beds in their areas. We have already found the requirements in question to be facially reasonable and non-confiscatory. The *84 rates which a nursing home charges its private patients are unregulated. Undoubtedly, many nursing homes will increase their rates to private patients to offset the net cost of maintaining indigent patients. We agree with the Appellate Division that there is nothing invidious in the notion as such. 168 N.J. Super. at 167. In its amicus brief, American Health Care Association concedes that there is no federal impediment to subsidization by private patients as long as it is not excessive. See Property Owners Assn. of N. Bergen v. Tp. of N. Bergen 74 N.J. 327 (1977); Borland v. Bayonne Hospital, supra. Any judgment on this score will have to await a case involving specific facts and circumstances.

V.
It is also argued that N.J.A.C. 8:30-14.1 et seq. conflict with the Federal Medicaid statute, 42 U.S.C.A. § 1396 et seq., and are void and unenforceable for that reason. As advanced, the argument is in two basic parts. First, it is submitted that the regulations compel a nursing home to participate in the State Medicaid program which under the federal statute must be on a voluntary basis. Second, assuming a state may compel participation in its Medicaid program, it is argued that the reimbursement rates set under New Jersey Medicaid fails to meet the "reasonable cost related basis" standard established under federal law, and therefore constitute a taking of property without just compensation. See 42 U.S.C.A. § 1396a(a)(13)(E). In short, it is claimed that the reimbursement rates set in the New Jersey Medicaid program are in violation of the Federal Medicaid statute. We decline to consider this collateral attack on State Medicaid rates. There is no factual record presented; moreover, the Department of Human Services which administers the Medicaid program in this State is not a party to this proceeding. While New Jersey Medicaid reimbursement rates are not immune to a proper challenge involving the proper parties and an adequate factual record, that situation is not present in the appeals before us.
*85 We need not decide whether federal law prohibits a state from compelling a health care facility, as a condition of licensure, to participate in the state's Medicaid program. The regulations in question do not so mandate. Although required to provide for a reasonable number of indigent patients, a nursing home is not obliged to seek Medicaid reimbursement. It can absorb the cost of maintaining an indigent patient as part of its operating expenses and, of course, is free to seek payment from any other available financial resources the patient may have. Without doubt, the regulations have the effect of strongly encouraging participation in the Medicaid program, but this is not prohibited under the federal statute. Indeed, such participation would seem to be in furtherance of the law's broad social objectives. While state participation in Medicaid is on a voluntary basis, those states which enter into the program are afforded considerable latitude in establishing a comprehensive medical assistance program. That this encompasses requiring provider participation in the caring for the indigent cannot be doubted.
Significantly, the Department of Health, Education, and Welfare, Region II, through its Principal Regional Official, in a letter dated September 18, 1979, has stated "that the New Jersey regulation on its face violates no provision of the [Federal] Medicaid statute" and that enforcement of the regulation would not jeopardize New Jersey's eligibility for federal funds as long as the nursing homes are certified as satisfying federal requirements for long-term care facilities.
Appellants argue that if they elect to participate in the State Medicaid program they subject themselves to that program's regulations and restrictions. In particular, reference is made to Circular Letter 88, now incorporated in N.J.A.C. 10:63-1.16(i)(5)(iii)(2)(C), which imposes restrictions on the involuntary transfer of a Medicaid patient, specifically a patient who enters a facility as a private patient and then becomes a Medicaid patient.
*86 The argument lacks merit. As heretofore noted, a licensed health care facility is subject to comprehensive regulation by the Department and, apart from Medicaid, can be restricted in the involuntary transfer of indigent patients or those who become indigent. One of the very regulations here involved, N.J.A.C. 8:30-14.4(a), empowers the Department, as an alternative to requiring a nursing home to make available a reasonable number of beds to indigent persons, to require the nursing home to maintain all patients regardless of their change in economic stature.
We have considered all of the remaining points argued and, without discussing them in detail, are satisfied that they are lacking in merit.
The judgment of the Appellate Division upholding the facial validity of the regulations is affirmed.
For affirmance  Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK  6.
For reversal  None.
NOTES
[1] The Public Advocate had filed a petition with the Department of Health, pursuant to N.J.S.A. 52:27E-32(a), seeking the adoption of an administrative rule requiring nursing homes to accept a certain number of indigent patients. The Commissioner, relying on the Attorney General's opinion, denied the petition on the ground that she lacked the legal authority to adopt such a rule. The Public Advocate then appealed this ruling to the Appellate Division.
[2] As a result of Formal Opinion No. 15-1977 the Public Advocate dismissed his appeal pending in the Appellate Division.
[3] The Board is part of the Department of Health. N.J.S.A. 26:2H-5(b) provides that "[t]he commissioner, with the approval of the board, shall adopt and amend rules and regulations * * *."
[4] At the present time, the rates which a nursing home may charge its private patients are unregulated. However, reimbursement rates for nursing care under the State Medicaid program are set by the Department of Human Services under federal guidelines. N.J.S.A. 30:4D-1 et seq.; see 42 U.S.C.A. § 1396a(a)(13)(E); 42 C.F.R. § 447.204.
[5] In this connection, the availability of Medicaid reimbursement should be considered in determining whether a nursing home is able to make "a just and reasonable rate on equity."